**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| CHRISTOPHER MILLER,<br>CHAREALE MILLER,<br>CHRISTOPHER MILLER, JR., and<br>DENAZHA MILLER,<br>c/o Friedman & Gilbert<br>50 Public Square, Ste. 1900<br>Cleveland, Ohio 44113,<br><br>      Plaintiffs,<br><br>-vs-<br><br>CITY OF CLEVELAND HEIGHTS,<br>DETECTIVE MARK SCHMITT (#610), and<br>OFFICER BENEDICT OSOWSKI (#347),<br>c/o City of Cleveland Heights Law Department<br>40 Severance Circle<br>Cleveland Heights, OH 44118<br><br>      Defendants. | Case No.<br><br>Judge<br><br><br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Christopher Miller and his children, Plaintiffs Chareale Miller, Christopher Miller, Jr., and Denazha Miller, state as follows for their Complaint:

### INTRODUCTION

1.     This is a civil rights action. Christopher Miller was wrongfully convicted in 2002 for a rape and robbery that he did not commit.  Miller was just 24 years old when he was arrested and jailed, then prosecuted, tried, and convicted for the rape of L.B.

2.     After years in prison and fighting to prove his innocence, Christopher Miller was finally exonerated and released on June 21, 2018.

3.     Miller was exonerated when DNA testing revealed the true identities of the two men who raped and robbed L.B.

1

4.     Misconduct by Cleveland Heights police officers Mark Schmitt and Benedict Osowski and those working in concert with them caused Miller's wrongful conviction, in violation of his constitutional rights.

5.     Miller therefore brings this action under 42 U.S.C. § 1983 and Ohio law seeking redress for the wrongs done to him, as well as to deter future misconduct.

6.     Likewise, Miller's children bring claims for their loss of consortium, seeking redress for the wrongs done to them and to deter future misconduct.

JURISDICTION AND VENUE

7.     This action arises under the laws of the United States, and jurisdiction is conferred on this Court under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights). Supplemental jurisdiction of the Court over the claims arising under state law is invoked under 28 U.S.C. § 1367 (supplemental jurisdiction).

8.     Venue in the Northern District of Ohio is proper under 28 U.S.C. § 1391(b), because it is the district in which many if not all of the defendants reside, and because a substantial part of the events or omissions giving rise to the claims occurred within the Northern District of Ohio.

PARTIES

9.     Plaintiff **Christopher Miller** is a 44-year-old resident of Northeast Ohio. At the time of his arrest in April 2001, Miller was 24 years old, and lived in Cleveland, Ohio.

10.    Plaintiffs **Chareale Miller** (25 years old), **Christopher Miller, Jr.** (20 years old), and **Denazha Miller** (19 years old) are the children of Plaintiff Christopher Miller. They are residents of Northeast Ohio.

11.    Defendant **City of Cleveland Heights** (the "City") is an Ohio municipal corporation that operates the Cleveland Heights Police Department.  Defendant City is a unit of

2

local government duly organized under the laws of the State of Ohio residing in the Northern

District of Ohio acting under the color of law. Defendant City is a "person" under 42 U.S.C. §

1983. Defendant City is the employer and principal of Defendants Detective Mark Schmitt

(#610) and Officer Benedict Osowski (#347) and is responsible for the policies, practices, and

customs of the Cleveland Heights Police Department ("CHPD").

12.     Defendants Detective **Mark Schmitt (#610)** and Officer **Benedict Osowski

(#347)** were, at all times relevant to the allegations made in this complaint, duly-appointed police

officers employed by the City of Cleveland Heights, acting within the scope of their employment

for the Defendant City and the CHPD and under the color of state law. They are sued in their

individual capacities.

### FACTS

13.     Christopher Miller grew up in Cleveland, Ohio. He was part of a tight-knit family,

including his mother, grandparents, aunts and uncles, cousins, and friends. Miller was his

mother's only child, and became the man of the house when he was young. He was the first

grandchild, the first nephew, and played a critical role in supporting his family.

14.      By April 2001, Miller had three beautiful children: Chareale Miller, Christopher

Miller, Jr., and Denazha Miller.

15.     Miller was an active father, involved in his children's lives.

16.     At the time, Miller lived with his girlfriend, Lena Green. They had a wonderful

family life.

17.     Though unknown to him at the time, Miller was about to unnecessarily lose his

promising future to wrongful conviction and incarceration.

18.     Miller would soon be named as a suspect for a rape and robbery he did not

commit—after purchasing a cell phone from a man on the street. Police would zero in on him as

one of the two perpetrators involved in the rape because the phone, unbeknownst to Miller, had been stolen during the rape and robbery. The detective on the case, Mark Schmitt, would trace the phone to him, and then—when Miller did not fit the original description provided by the victim of the attack—Schmitt, with Osowski standing by, would:

    a.    Manipulate the victim's memory, shaping her recollection to reflect a new suspect description that would match Miller's outfit;

    b.    Convince her that Miller was the perpetrator, using the manipulated memory of her attacker's outfit;

    c.    Get her to pick Miller out of a suggestively-compiled and -presented photo array;

    d.    Memorialize the new, fabricated description of the perpetrator in police reports;

    e.    Initiate prosecution against Miller without probable cause and based on false evidence;

    f.    Provide this false evidence to the prosecutor;

    g.    Present fabricated evidence at trial himself;

    h.    Facilitate the victim's presentation of false evidence at trial;

    i.    Suppress and withhold material, exculpatory evidence—including the victim's original description (which did not match Miller), the unduly suggestive identification, and the fact that the case was based on fabricated evidence—from Miller, his counsel, and the prosecutor before, during, and after trial;

    j.    Cause Miller's wrongful conviction, premised heavily on the fabricated evidence of the victim's allegedly consistent description and identification of her attacker;

    k.    Continue for years to suppress and withhold this material exculpatory evidence, even after a CODIS DNA hit identified one of the victim's true attackers;

l.    Manipulate statements and testimony again—now focusing on the accomplice to the true attacker;

m.    Provide and facilitate the presentation of additional fabricated evidence during the trial of the true attacker, in an effort to continue to implicate Miller even though it was clear he did not commit the crime;

n.    Withhold and suppress this new round of fabricated evidence from Miller, his counsel, and the prosecutor;

o.    Intentionally cover up Miller's innocence for over seventeen years, until Miller was finally exonerated in 2018—after advanced DNA testing excluded Miller, and proved that the rape and robbery had been committed by two other men.

19.    Miller suffered all of these traumatic and terrifying events as an innocent man, accused and convicted of a crime he did not commit. Today, freed from prison, Miller seeks to expose the misconduct that caused his wrongful conviction.

**Stadmire and Boyd Attack L.B.**

20.    On April 28, 2001, L.B. returned home to her ground-floor apartment just after 11 PM. She entered her unit through an exterior door at the bottom of a half-flight of stairs.

21.    As L.B. turned to close the door behind her, she heard male voices coming from the half-flight of stairs that led to the driveway. When she called out, two men appeared at the top of the landing.

22.    These the men were Richard Stadmire and Charles Boyd.

23.    One of the men grabbed L.B.'s arm and held a gun to her neck.

24.    The two men forced her into the apartment at gunpoint, and began searching for valuables.

25.    After only finding about $25.00 in L.B.'s purse, both men sexually assaulted her.

26.     Before leaving, one man kicked L.B. in the head and told her not to report the attack. The attackers then took L.B.'s purse, cell phone, and other items with them.

27.     Christopher Miller was not present at L.B.'s apartment that night.

28.     Miller did not know L.B., Richard Stadmire, or Charles Boyd.

29.     Christopher Miller did not conspire or participate in any way with Richard Stadmire and Charles Boyd in their crimes against L.B.

**Police Investigation Begins**

30.     After Stadmire and Boyd left, L.B. fled to a neighbor's apartment. They called the police.

31.     Cleveland Heights Police responded to the scene, where they met L.B.

32.     Defendant Detective Ben Osowski took a description from L.B.

33.     Police immediately began searching for physical evidence.

34.     L.B. was transported to a hospital, where she underwent an examination and a rape kit was collected.

35.     At the hospital, Defendant Schmitt interviewed L.B. Defendant Osowski was present during this interview.

36.     L.B. was only able to give a description of one of her attackers.

37.     After her discharge from the hospital, L.B. returned to her apartment with Defendant Schmitt and walked him through the events of the assault.

**Miller is Identified, Pursued, and Arrested by Schmitt**

38.     Detectives focused on L.B.'s missing cell phone as their primary lead, tracing phone calls made from the phone after the attack.

39.     On the night of the attack, a call was made to the emergency contact in L.B.'s datebook, which had been stolen along with her purse. Around 7:11 A.M. the next morning,

6

someone re-dialed the same number. At 7:24 A.M., the phone was used to access the voicemail, and then ten minutes later the phone was used to dial another number stored internally in the phone.

40.     Half an hour later, just before 8:00 A.M., the phone began a period of steady use, including multiple calls to Christopher Miller's girlfriend, Lena Green. Police spoke to Green, who confirmed that Miller had called her from that number.

41.     Defendant Schmitt pursued and quickly located Miller.

42.     Defendant Schmitt, accompanied by Defendant Osowski and other officers, arrested Miller two days after L.B.'s report, on April 30, 2001.

43.     At the time of his arrest, Miller was wearing a white Toronto Raptors jersey with curved, orange-red "Raptors" lettering and orange-red number "15" emblazoned on the chest, with blue-purple trim.

44.     Knowing he was innocent, Miller consented to a search of his residence and answered police questions voluntarily.

45.     Defendant Schmitt interviewed Miller. Defendant Osowski was present during this interview.

46.     Miller admitted to having the phone and using it to make calls—but he told Defendants that he had purchased the phone from a man on the street on the morning of April 29, 2001.

47.     Miller reported that he got a charger for the phone from a friend later that day.

48.     Several people confirmed this basic narrative to police.

49.     Miller admitted to suspecting the phone might be stolen, and to throwing the phone into a sewer when he heard police were looking for it.

50. Miller also provided an alibi for Saturday night—he had been at home, in bed.

51. Lena Green also told police that Miller was at home in bed on Saturday night.

52. Nonetheless, Defendant Schmitt, Osowski, and other CHPD officers continued to pursue charges against Christopher Miller for the rape and robbery of L.B.

**L.B. Identifies Miller**

53. Shortly thereafter, on or about April 30 or May 1, 2001, Defendant Schmitt showed L.B. a six-pack photo array.

54. The photo array contained a photo of Miller on the day he was arrested.

55. The photo of Miller depicted him in the white Toronto Raptors jersey with curved, orange-red "Raptors" lettering and orange-red number "15" emblazoned on the chest, with blue-purple trim.

56. L.B. studied the pictures for roughly four or five minutes before identifying Miller as one of her attackers.

57. Based on L.B.'s identification, Miller was charged with multiple counts of rape, aggravated robbery, aggravated burglary, kidnapping, intimidation, and felonious assault.

**Forensic Evidence Excludes Miller During Investigation**

58. Shortly after the attack, the Cuyahoga County Coroner's Office began processing the physical evidence collected from the scene.

59. Using what was new technology at the time, STR-DNA testing (which is considered primitive testing technology today) was conducted on samples in the rape kit. Testing revealed a mixture—with two contributors.

60. Only one contributor could be identified through STR-DNA testing, however. Testing revealed that this contributor was a single male profile—and that Miller was excluded as a contributor for that profile. This contributor was not Christopher Miller.

61. The second contributor to the DNA mixture was determined to be an azoospermatic contributor. With samples collected from Miller's home, the lab also confirmed that Miller is not azoospermatic. Thus, this azoospermatic contributor could not be Miller—and the contributor remained unidentified.

62. The coroner's office did not find any of L.B.'s DNA on Miller's clothing, including the jersey he allegedly wore during the attack.

63. The State even tested cat hairs from Miller's clothes, hoping they would match the hairs from L.B.'s cat. The hairs were not a match.

64. Despite searching Miller's home and numerous rounds of forensic testing, police were unable to find any physical evidence tying Miller to the crime.

65. In spite of this clear evidence excluding Miller, the case proceeded toward trial based on L.B.'s faulty identification and Miller's possession of the phone.

**Miller Maintains His Innocence While Facing a Potential Life Sentence**

66. Prior to trial, the State offered Miller a plea deal, asking Miller to admit guilt and name his accomplice in exchange for dropping the violent predator specification—which carried a potential life sentence—and for a recommendation of a sentence of just seven years.

67. Miller refused to take the deal, insisting on his innocence.

68. On the record, Miller's counsel stated she had advised Miller of the plea offer, but that Miller refused it and continued to assert his innocence. The Court addressed Miller on the record, to confirm that he understood the potential penalties and risks of proceeding to trial.

69. Miller refused to stand down. He continued to assert his innocence and said he could not accept any plea deal.

70. Miller asked the Court for permission to take a lie detector test to prove he was telling the truth. The Court denied the request.

71.     The Court instructed Miller to continue to discuss the State's plea offer with his attorney over a lunch recess.

72.     When court reconvened, Miller once again refused to plead guilty and asked the Court to appoint him new counsel. His request was denied. The case proceeded to trial.

**Evidence at Trial**

73.     The State's case at trial relied primarily on L.B.'s identification of Miller and on Miller's possession of L.B.'s cell phone.

74.     L.B.'s allegedly consistent identification of Petitioner's clothing, even prior to Miller's arrest, was used to bolster her credibility during trial and pretrial proceedings.

75.     L.B.'s identification of Miller's clothing played a significant part in the State's case at trial. In opening arguments, the prosecutor emphasized the connection and the fact that she had identified Miller's clothing before his arrest, stating, "Several days later when he's arrested with some of the same clothing on that she described to Detective Schmitt that he had on that night – and listen carefully, she will describe for you the clothing that he was wearing, and some of that same clothing he had on a couple of days later when he was arrested." The prosecutor repeated to the jury that L.B. "will talk to you very specifically about what she saw with regards to the clothing."

76.     While testifying at trial, L.B. admitted she had only seen one of the attackers briefly, but she testified she was confident regarding her identification of Miller.

77.     L.B. identified Miller's black jean jacket as the one worn by the perpetrator. She described the attacker with the gun as wearing a V-neck shirt with  "the half-circle, the writing," which she testified "look[ed] to be like" the State's Exhibit 40—Miller's Toronto Raptors jersey with curved, red lettering, worn by Miller on the day he was arrested.

78.     Defendant Schmitt also testified that L.B. gave information to him the night of the attack, walking him through what happened. Schmitt also testified that at his May 1, 2001 meeting with L.B.—where he showed her the six-pack photo lineup, including a photo of Miller in his Raptors jersey on the day of his arrest—that L.B. identified the Raptors jersey as the shirt worn by her attacker during the assault.

79.     However, forensic experts testified that there was <u>no</u> physical evidence—including DNA and fingerprints—tying Miller to the crime.

80.     Lena Green testified that she observed Miller at home, asleep in bed, on the night and time of the attack.

81.     The man who sold Miller the phone—Dwayne Collins—testified that Miller did, indeed, buy the phone from him on Sunday morning, April 29, 2001.

82.     Collins testified that he found the phone in the bushes while stopping to urinate near a bridge as he walked northeast on St. Clair Avenue. Collins testified that shortly after he found the phone, he came across Miller and, though he did not know Miller, Collins sold the phone to him.

83.     Miller's friend, Desmond Fletcher, confirmed that they purchased the phone from a man on the street—though his original account of the timing of this sale varied slightly from Miller's statements to police and Dwayne Collins' account on the stand.

84.     In closing, the State argued L.B.'s identification and Miller's possession of her cell phone amounted to proof beyond a reasonable doubt. The prosecutor repeatedly emphasized the accuracy of L.B.'s identification in closing arguments, and the fact that her initial description at the hospital matched what Miller later turned out to be wearing: "So she made the identification. She told – she described essentially what he was wearing. She could see that it

was a white shirt on under this big jacket with the slanted pockets. You will have this stuff back

there to look at it, and that it had the semicircle writing. Well, folks, lo and behold, what do they

find on the defendant when they arrest him? There's the semicircle writing. You see the jacket in

here. It's in here somewhere. It's got the slanted pockets where he pulled the gun out when he

initially confronted her."

85.     The prosecutor continued during rebuttal, remarking how it would have to be an

amazing coincidence for L.B.'s initial description to match Miller's clothing so closely: "As I

said before to you folks, the coincidence here is just phenomenal. It's just incredible that [L.B.]

could identify this man wearing a shirt with some circular letters on it, wearing a jacket with

slanted pockets that she saw the gun come out of. A couple days later, they find this defendant

wearing that – wearing that clothing, wearing that jersey when he's arrested, had had possession

of that cell phone. Now, that coincidence is just absolutely unfathomable. It's incalculable."

86.     The jury deliberated for three days before convicting Miller—without ever being

presented with any reason to believe that L.B.'s account (and Defendant Schmitt's retelling of

her account) had changed or was not accurate.

87.     At the end of the first day of deliberations, the jury reported back that it was

deadlocked. The Court instructed the jury to continue deliberations. The jury returned the next

day with multiple questions, including whether the Defendant had passed a lie detector test, and

whether they could review the original police reports and witness statements. The Court

instructed the jury that lie detector tests were not admissible, and that it had all of the statements

that would be made available.

88.     Finally, after three days of deliberations, the jury reached a verdict. Miller was

convicted of aggravated burglary, two counts of rape with a sexually violent predator

specification, aggravated robbery, kidnapping, felonious assault, and intimidation. All of the charges carried firearm specifications.

89.     Miller—an innocent man—was sentenced to forty years in prison.

90.     Miller was transferred into custody of the Ohio Department of Rehabilitation and Correction. He began living the next stage of this nightmare—serving a prison sentence for a conviction built on fabricated evidence.

**A CODIS Hit Identifies Stadmire As One of the Men Who Assaulted L.B.**

91.     Three years later, in or around August 2004, the Ohio Bureau of Criminal Investigation and Identification (BCI) found a match to the male DNA profile from L.B.'s rape kit in the federal CODIS database.

92.     The profile was matched to Richard "Marlon" Stadmire.

93.     This was not the first sexual assault linked to Richard Stadmire. In May 2001, about three weeks after the attack against L.B., Stadmire and another man were arrested and charged with a separate sexual assault and robbery—about five miles away from L.B.'s apartment, in Mayfield Heights, Ohio.

94.     In that case, the perpetrators ambushed the victim, held a gun held to her neck, and forced her into her car. She was then sexually assaulted and robbed.

95.     Richard Stadmire was quickly caught for the crime and convicted in March 2002. *State v. Stadmire*, 8th Dist. Cuyahoga No. 88735, 2003 Ohio App. LEXIS 811.

96.     The other man involved in the Mayfield Heights attack was Stadmire's friend and accomplice, Charles Boyd.

97.     Boyd pleaded guilty to his involvement in the Mayfield Heights attack, and received lenience in exchange for his testimony against Stadmire at trial.

98.     The CODIS hit resulting from the Mayfield Heights case resolved the identity of the male DNA profile recovered in the rape kit in L.B.'s case.

99.     The second contributor to the mixture—the azoospermatic contributor (who could not have been Miller because he was not azoospermatic)—remained unidentified.

100.    Boyd—Stadmire's accomplice in the Mayfield Heights case—should have been the obvious suspect.

**Schmitt Manipulates Boyd's Account to Ensure Miller's Conviction Would Stand**

101.    In 2004, after learning CODIS had matched the L.B. assault to Stadmire, Defendant Schmitt separately interviewed Stadmire and Boyd. Both men were initially uncooperative and denied any involvement in the attack against L.B.

102.    Defendant Schmitt showed both men photographs of Christopher Miller.

103.    At the time, Boyd was incarcerated with Miller at Mansfield Correctional Institution, and he only confirmed that he recognized Miller as a fellow inmate.

104.    Stadmire also reviewed the photo array and told Schmitt he was unable to identify anyone.

105.    Several weeks later, Defendant Schmitt re-interviewed Boyd.

106.    Schmitt manipulated Boyd's statements and testimony to implicate Miller, in order to ensure that Miller's conviction would withstand this new evidence—which included both a DNA match and the identification of the two men who assaulted L.B.

107.    In this second interview, Boyd admitted that he was a part of the attack against L.B. Schmitt noted that Boyd was able to describe the layout of L.B.'s apartment "exceptionally well" and provided a detailed description of L.B. in the apartment.

108.    Boyd was adamant, however, that he had never entered L.B.'s apartment. Instead, according to his new story conceived of through Schmitt's interview, Boyd had simply waited outside as lookout, while Stadmire and Miller robbed and raped L.B.

109.    When pressed, Boyd admitted he did not know Miller well and his 2004 story did not add up: Boyd claimed he only met Miller a few hours before the attack against L.B., and claimed that after the rape, he and Stadmire went to a club to split the proceeds of the robbery, while Miller simply disappeared on foot, miles away from his home.

110.    Both Boyd and Stadmire were charged as accomplices in L.B.'s rape.

111.    Once again, Boyd accepted a plea deal in L.B.'s case—for his alleged role as "lookout"— in exchange for his testimony against Stadmire.

112.    Stadmire was indicted for the rape, robbery, and kidnapping of L.B. in January 2005. He pleaded not guilty and went to trial in June 2006.

### Schmitt Offered Fabricated Testimony at Stadmire's Trial to Ensure Miller's Conviction Would Stand

113.    At Stadmire's trial in the L.B. case, Defendant Schmitt doubled down on his commitment to ensuring Christopher Miller's conviction would stand.

114.    Instead of fixing his grave mistake—convicting the wrong man for the rape and robbery of L.B.—Schmitt fed fabricated evidence to the prosecution yet again, concealing his misconduct in the investigation and prosecution of Miller.

115.    Though L.B. testified consistently with her prior testimony that only two people were involved in the attack, Schmitt testified that "[L.B.] indicated to me on—twice after the incident that there was a third male, possibly due to her sense of hearing the movement of individuals about her, moving behind her head." Schmitt admitted that he never wrote about

L.B.'s description of a third person in any of his notes or reports, but also rejected L.B.'s account, testifying that "it's not her responsibility to remember the facts of the case."

116.     Miller was called as a defense witness, and was transported from prison to testify. He continued to assert his innocence and testified that he had never met Stadmire before in his life. He also testified that the first time he met Charles Boyd was when they were incarcerated together at Mansfield Correctional Institution, while Boyd was serving his sentence for the Mayfield Heights attack.

117.     On June 12, 2006, Richard Stadmire was convicted on all four counts.

118.     After his testimony, Charles Boyd pleaded guilty to a single count of aggravated robbery and was sentenced to just five years, to run concurrently with his sentence from the Mayfield Heights attack. *State of Ohio v. Charles Boyd*, Cuyahoga C.P. No. CR-05-461537-A (June 23, 2005).

## Miller Continues to Fight to Prove His Innocence

119.     Miller mounted multiple legal challenges to his wrongful conviction, including multiple motions for new trial.

120.     Miller maintained his innocence over years of suffering imprisonment for a crime he did not commit.

121.     Miller continued to try to free himself from the terror of wrongful conviction and imprisonment through these motions and by conducting continuing investigation.

122.     After the Stadmire trial, Miller raised the CODIS hit to Stadmire as part of a motion for new trial in 2007. That motion was denied.

123.     Miller continued to steadfastly assert his innocence as he suffered the unconscionable effects of Defendants' fabricated and suppressed evidence and manipulation of L.B.'s identification, locked away in prison as an innocent man.

16

**Suppressed Material Exculpatory Evidence Comes to Light in 2016**

124.     A decade later, additional evidence establishing Miller's wrongful conviction finally surfaced: In 2016—in response to a public records request—new police reports and notes, which had been written shortly after the attack on L.B., were disclosed for the first time. These new reports and notes contained material exculpatory evidence—and established that Defendant Schmitt presented false and fabricated evidence to prosecutors, offered false testimony at trial, and that L.B. testified inaccurately.

125.     The new reports and notes established that key aspects of L.B.'s description changed in the days after the attack.

126.     The new reports and notes established that L.B. provided a clear description of one of the perpetrators immediately following the attack. At the hospital after the attack, Defendant Officer Benedict Osowski noted that L.B. "described the first male as a blk male about 5'11", 150 to 170 lbs, 18 to 22 yrs old, no facial hair, wearing a wht [sic] T-shirt possibly with a black circle on the chest, blue jeans, and wearing a green coat."

127.     The new reports and notes also included an undated page of handwritten notes by Defendant Schmitt, which describe the suspect as wearing a "White T-shirt unknown sleeve length, maybe black circle in middle of chest" and a "Green coat."

128.     The reports also established that one of the police officers who responded to the scene of the crime made a note that "Upon my arrival I began searching the area for two suspects, 1-black male age 18-22, green coat, dark shirt, and no facial hair . . ."

129.     These reports and notes—and the vastly different description of the suspect's clothing—had never been disclosed to Miller or his defense attorneys at the time of trial.

130.     These reports and notes—and the vastly different description of the suspect's clothing—stand in stark contrast to the description in subsequent reports by Defendant Schmitt,

in statements drafted by Schmitt, and in Schmitt's and L.B.'s testimony both at the suppression hearing and at trial.

131.    No green coat or white shirt with black circle or dark shirt was ever found at Miller's house.

132.    These new reports and notes establish that when Miller was arrested wearing the Raptors jersey, and police searched Miller's home but found no green coat or t-shirt matching L.B.'s original description, Schmitt manipulated L.B.'s memory, subsequent statements, and testimony to describe Miller—by reflecting a suspect wearing a Raptors Jersey and the black jean jacket found during the search.

133.    Comparing these newly disclosed reports and notes with other previously disclosed reports and testimony, it is clear that L.B.'s description of the attacker's clothing changed significantly when Schmitt questioned her further after Miller's arrest:

 a. On or about May 1, 2001, right after Miller was arrested, Defendant Schmitt showed L.B. Miller's Raptors jersey—white, with orange-red "Raptors" lettering and orange-red number "15" emblazoned on the chest, with blue-purple trim— and the black jean jacket.

 b. Defendant Schmitt manipulated L.B.'s memories to reflect Miller's clothing, thereby causing his wrongful conviction.

 c. Over a week later, in her official—and manipulated—statement prepared by Defendant Schmitt, L.B. incorporated features of the jersey into her description. She no longer described a white t-shirt with "maybe" a black circle on the chest. Instead, she stated that "the shirt this male wore underneath the coat had a V neck, white in color, the coat was buttoned up, and the shirt had what appeared to me a

18

circle of *writing,* which the *letters were big in size*." Likewise, L.B.'s description

of the coat also changed, from "green" to "dark gray."

d. L.B.'s new, manipulated memories and description were repeated in a pretrial

hearing in October 2001, where defense counsel attempted to suppress L.B.'s

identification of Miller. At that hearing, L.B. described her attacker as wearing a

"gray jacket" and claimed that "circular *writing*" (not a black circle) appeared on

the t-shirt.

e. Defense counsel specifically asked at the suppression hearing whether this was

the same description she had given police the night of the crime. L.B. testified to

her manipulated memory—insisting that she provided this information "on the

night of April 28th"—the night of the attack. L.B. insisted that she provided the

same information to police that night, "as far as the details and nature of the

description."

f. Defendant Schmitt went even further than L.B. at the suppression hearing—

offering additional, completely fabricated testimony. Schmitt testified that the

description L.B. provided to him at the hospital included a "jersey material" with

a "semi-circular pattern or writing, and a number. She remembered the colors,

primarily white. She remembered some red and possibly blue," and a "dark-

colored coat" with "certain pockets."

g. But these alleged features were not memorialized in the police reports or notes

written right after the attack on L.B.—and at the time when police were actively

pursuing an unknown suspect or suspects. Instead, these features pose stark

contradictions to the descriptions memorialized in the previously undisclosed

reports and notes that were concealed and withheld from Miller until years after his wrongful conviction.

h. Miller and his defense counsel were unable to challenge Schmitt's fabricated account of L.B.'s original description and L.B.'s new, manipulated description at the suppression hearing because these reports and notes, and the exculpatory information contained therein, had never been disclosed to them before or during that hearing.

i. At trial, L.B. again testified to her new, manipulated memories and description of the attacker. L.B. testified at trial that—instead of a white shirt that possibly had a black circle on the chest—she saw a V-neck shirt with a half-circle of writing. She also identified Miller's black (not green) jacket as the jacket of her attacker.

j. Likewise, Schmitt testified that L.B. gave information to him the night of the attack, walking him through what happened. Schmitt also testified that at his May 1, 2001 meeting with L.B.—where he showed her the six-pack photo lineup, including a photo of Miller in his Raptors jersey on the day of his arrest—that L.B. identified the Raptors jersey as the shirt worn by her attacker during the assault.

k. Miller and his defense counsel were unable to challenge Schmitt's fabricated testimony and L.B.'s new, manipulated description at trial because these original reports and notes, and the exculpatory information contained therein, were not disclosed to them before or during trial.

134. Until 2016, neither Miller nor his counsel were provided with the early reports and contemporaneous notes written by Defendant Officer Osowski and Defendant Detective

20

Schmitt that detail L.B.'s initial description of her attacker—and which directly contradict sworn testimony by both L.B. and Defendant Schmitt.

135.    These reports and notes also exposed the previously-concealed suggestiveness of the identification procedures employed by Schmitt.

136.    In the photo array shown to L.B., the photo of Miller depicted him in the white Toronto Raptors jersey with curved, orange-red "Raptors" lettering and orange-red number "15" emblazoned on the chest, with blue-purple trim.

137.    The now-exposed reports and notes—and the stark differences between the original description and L.B.'s identification of Miller, along with her later statements and testimony—demonstrate that Schmitt manipulated L.B.'s memory in an effort to cause her to identify Miller as her attacker in the photo array.

138.    Both Defendant Schmitt's conduct and the manner in which he compiled and presented the photo array during this identification procedure with L.B. were unduly suggestive and prejudicial and infected L.B.'s memory and identification.

139.    L.B.'s identification of Miller was the result of unduly suggestive photo array procedures, which were unnecessary and created a substantial prospect of a misidentification.

140.    L.B. made her identifications as a result of CHPD's use of improper identification procedures.

141.    Because of L.B.'s faulty identification, Miller was charged with multiple counts of rape, aggravated robbery, aggravated burglary, kidnapping, intimidation, and felonious assault.

142.    Miller and his counsel were unavoidably prevented from discovery of all of these facts.

143.    Defendants Schmitt and Osowski suppressed material, exculpatory information from the defense at trial, in violation of Miller's rights under the Fourteenth Amendment to the United States Constitution.

144.    But for this suppression, there is a reasonable likelihood the jury would not have found Miller guilty at trial.

145.    Miller's conviction was obtained by use of false testimony by Defendant Schmitt and the manipulated testimony of L.B., procured by Schmitt.

146.    Defendants Schmitt and Osowski knew and/or should have known that testimony offered in support of Miller's conviction was false, but failed to correct such testimony.

147.    There is a reasonable likelihood that the false testimony offered in Miller's trial affected the judgment of the jury.

### Miller Files an Application for DNA Testing, a Motion for New Trial, and a Petition for Post-Conviction Relief

148.    Now represented by the Ohio Innocence Project, after disclosure of the reports and notes, Miller filed an Application for DNA testing. The Motion, filed on March 29, 2017, cited the need for testing based on the newly-disclosed reports and notes and on grounds that modern DNA testing could now conclusively determine the identity of the second attacker.

149.    In response, the State of Ohio confirmed that almost all of the original evidence still existed, refrigerated, at the Cuyahoga County Medical Examiner's Office.

150.    In April 2017, Miller also filed a Motion for New Trial and Petition for Post-Conviction Relief.

151.    Also in April 2017, the State agreed to conduct DNA testing. Miller's Motion for New Trial and Petition for Post-Conviction Relief were held in abeyance during the testing process.

### In May 2018, DNA Testing Revealed Boyd as Stadmire's Accomplice and
### Miller was Exonerated

152.     On May 31, 2018, BCI issued a report reflecting the outcome of DNA testing

from the rape kit in L.B.'s case.

153.     BCI's DNA analysis established that Charles Boyd was, in fact, the second man

who raped L.B. with Richard Stadmire.

154.     With these results, on June 8, 2018, Miller filed a Petition for Post-Conviction

Relief pursuant to Ohio Rev. Code § 2953.21, seeking immediate vacation of his conviction and

release from prison.

155.     On June 21, 2018, the trial court vacated Christopher Miller's convictions and

dismissed all charges against him.

156.     On June 21, 2018, Christopher Miller was released from custody.

157.     On that day, Christopher Miller again became a free man.

158.     After more than seventeen years living a nightmare scenario, Christopher Miller

was finally free to join his children, Lena, and the rest of his family and friends.

### Defendant Officers' Fabrication of Evidence, Suggestive Identification
### Procedures, and Suppression of Exculpatory Evidence

159.     Because the newly-disclosed reports and notes were never turned over the to the

defense, neither Miller nor his counsel were made aware before or during trial of the

discrepancies in L.B.'s descriptions or of Schmitt's and Osowski's knowledge about L.B.'s

shifting descriptions.

160.     Miller was therefore deprived of the opportunity to investigate any leads related to

L.B.'s descriptions. Miller was also deprived of the opportunity to investigate, challenge, or

impeach Defendant Schmitt's fabricated evidence, Defendant Osowski's knowledge about L.B.'s

prior descriptions, and L.B.'s manipulated memory.

161. Upon information and belief, prior to and/or during trial, Defendants and other CHPD officers had knowledge that L.B. had not, in fact, identified Miller in her original descriptions, that L.B.'s memories and account had been manipulated, and that Schmitt fabricated evidence.

162. None of the Defendants nor any other CHPD officer informed Miller or his counsel of their knowledge that L.B. had not identified Miller in her original descriptions, that L.B.'s memories and account had been manipulated, or that Schmitt fabricated evidence before or during trial.

163. Defendants' failures to disclose this exculpatory information deprived Miller of his right to a fair trial.

164. As a result, Miller was deprived of the opportunity to investigate, challenge, and impeach their evidence, along with the evidence of other witnesses.

165. Further, at no point during subsequent legal proceedings—including Miller's various post-conviction motions over the years, Stadmire's trial, and Boyd's plea—did any Defendant officer or any other CHPD officer disclose the exculpatory information that had been previously suppressed as described in this Complaint.

166. Each of the Defendant officers were aware of the other Defendant officer's misconduct and knew or should have known that Christopher Miller was not the man who attacked L.B.

167. Defendants' conduct involved suppression, fabrication, and otherwise unconstitutional conduct concerning material evidence and was unduly prejudicial in the case against Miller.

168.    Upon information and belief, supervisors in the CHPD were aware of, ratified, and encouraged unconstitutional conduct of Defendants Schmitt and Osowski during the course of the investigation, and before, during, and after trial.

169.    Likewise, upon information and belief, these Defendants were aware of each other's misconduct in fabricating and suppressing evidence for and at trial, and their other unconstitutional conduct as described in this Complaint, including but not limited to conducting or being aware of the use of suggestive identification procedures.

170.    Upon information and belief, the Defendant Officers suppressed and/or destroyed additional evidence still unknown to Plaintiff, which would have shown Miller's innocence.

171.    The Defendant Officers and their fellow CHPD officers upheld a "code of silence" in which they did not disclose the improprieties alleged herein—among other known and unknown improprieties—in order to protect each other and ensure they could continue to engage in their egregious behavior with impunity.

172.    Miller was taken into custody without probable cause and jailed for months and then imprisoned for years.

173.    Defendants ignored and withheld evidence of Miller's innocence and instigated, influenced, or participated in the prosecution of Miller despite lacking probable cause and instead being aware of or knowing that there was evidence indicating his innocence.

174.    In addition to the affirmative misconduct described in this Complaint, the Defendant Officers willfully ignored and acted to undermine evidence that showed conclusively that Miller had nothing to do with the attack on L.B.

175.    If the prosecutors had known that the Defendant Officers fabricated and suppressed evidence and committed the other misconduct described herein, they would not have

pursued the prosecution of Plaintiff, and his unlawful detention would not have been initiated or continued.

176.    Had the Defendant Officers disclosed their fabrication and suppression of evidence and other misconduct to prosecutors, or to the Miller or his counsel, the prosecution would not have been pursued and Miller would not have been convicted.

177.    At all relevant times during the trial of this matter, the stated policy of the attorneys in the Cuyahoga County Prosecutor's Office was to disclose all exculpatory evidence of which they were aware.

178.    The exculpatory evidence described in this Complaint was not provided by the Defendant Officers or any member of the Cleveland Heights Police Department to any member of the Prosecutor's Office.

179.    The Defendant Officers' misconduct continued even after Miller was convicted and during the time he was pursuing appellate and post-conviction relief, including during the pendency of Miller's post-conviction motions, Stadmire's trial, and Boyd's plea.

180.    Defendants' conduct as described in this Complaint caused extreme prejudice to Miller in the criminal proceedings at issue here.

181.    Upon information and belief, Defendants Schmitt and Osowski were never investigated nor disciplined for their conduct described in this Complaint—including ongoing misconduct after Miller's trial, during Stadmire's trial, and the pendency of Miller's various post-conviction motions—even though their misconduct was obvious and known to other CHPD officers and supervisors.

182.    It was only after Miller's exoneration and the unavoidable truth established through DNA testing that Boyd was indicted for his role in the rape of L.B.—he pleaded guilty

26

on November 21, 2018. *State of Ohio v. Charles Boyd*, Cuyahoga C.P. No. CR-18-629895-A (November 21, 2018).

### Defendant City of Cleveland Heights' Policies and Practices

183.    The wrongful conviction of Christopher Miller was caused by the City of Cleveland Heights and its Police Department, as a result of the CHPD's illegal official policies, final policymaker's ratification of illegal actions, policies of inadequate training and supervision, and the existence of a custom of tolerance or acquiescence of federal rights violations.

184.    The misconduct described in this Complaint was undertaken pursuant to the policies and practices of the Defendant City and the CHPD in that Cleveland Heights police officers regularly used unconstitutional measures to falsely implicate criminal suspects, including by withholding and/or suppressing exculpatory evidence, fabricating evidence, feeding information to victims and witnesses, engaging in unduly suggestive identification and lineup procedures, and engaging in leading, manipulative, and unduly suggestive questioning of and contact with victims and witnesses.  These were widespread, clear, and persistent patterns and practices of the officers in the CHPD and established for years before the prosecution of Christopher Miller.

185.    It was a widespread, clear, and persistent pattern and practice of the officers in the CHPD not to turn over investigative notes, including statements of victims and witnesses, taken during the course of an investigation.

186.    Likewise, the CHPD has a historical practice of using suggestive and/or coercive identification procedures and of manipulating victims or witnesses to testify in a manner inconsistent with the truth.

187.    These widespread practices were so evident and well-settled as to constitute *de facto* policy in the Cleveland Heights Police Department, and it was allowed to exist because

municipal policymakers with authority over the practice exhibited deliberate indifference to the problem, thereby effectively ratifying it.

188.    The misconduct described in this Complaint was undertaken pursuant to the policy of the Defendant City and the CHPD in that the City and CHPD had inadequate policies, training, and supervision on the following: Cleveland Heights police officers' obligation to disclose exculpatory and impeachment evidence; the fabrication of evidence or police reports; the obligation not to manipulate victim or witness accounts; the handling, preserving, and disclosure of exculpatory or impeachment evidence; identification procedures; writing of police reports or notes of witness statements; and testifying at trial; even though the need for such policies, training, and supervision was obvious.

189.    The importance of and need for training was known to final policymakers of the City and CHPD.  At all times relevant to this Complaint, policymakers for the City and the CHPD knew of these problems, allowed them to continue, and made decisions not to implement adequate policies, training, or supervision.

190.    The constitutional violations complained of by Plaintiff were a highly predictable consequence of a failure to equip Cleveland Heights police officers with the specific tools—including polices, training, and supervision—to handle the recurring situations of how to process, preserve, and disclose exculpatory or impeachment evidence, how to conduct victim and witness interviews and interactions, how to conduct identifications and how to use photo arrays, how to write police reports or notes of witness statements, and how to provide testimony at trial.

191.    The misconduct described in this Complaint was undertaken pursuant to the policy and practice of the Defendant City and the CHPD in that there was a widespread, clear,

and persistent practice of police corruption within the CHPD at all times relevant to this Complaint.

192.    The City and CHPD were on notice of a widespread problems with police corruption prior to and after the misconduct described herein.  This widespread practice was so well settled as to constitute a *de facto* policy in the Cleveland Heights Police Department, and the practice was allowed to exist because municipal policymakers with authority over the practice exhibited deliberate indifference to the problem, effectively ratifying it.

193.    The City and CHPD ratified the illegal actions of CHPD officers, and the CHPD allowed misconduct—such as the misconduct described in this Complaint and other similar conduct—to continue unabated and without consequence, giving rise to the existence of a custom of tolerance or acquiescence of federal rights violations within the CHPD.

194.    The misconduct described in this Complaint was undertaken pursuant to the policy of the Defendant City and the CHPD in that the City and CHPD decided not to implement any legitimate mechanism for oversight or punishment of officers who violated their *Brady* obligations or citizens' constitutional rights, or who fabricated evidence or fed information to or manipulated the accounts of victims and witnesses or used suggestive identification procedures. This led officers to believe that they could violate citizens' constitutional rights with impunity.

195.    Defendant City and the CHPD have a long history—from well before Miller's prosecution and continuing beyond his conviction—of failing to supervise, investigate, and discipline allegations of officer misconduct, including the Defendant officers named in this Complaint.

196.    At all times relevant to this Complaint, policymakers for the City and the CHPD knew of these problems and allowed them to continue, even though the need for a legitimate

mechanism for new or different policies, training, oversight, or punishment of officers was obvious. The constitutional violations complained of by Plaintiff were a highly predictable consequence of the failure to have such mechanisms in place.

197. The policies and practices of the Defendant City and the CHPD were the moving force behind the misconduct described in this Complaint and the violation of Plaintiff's rights. The widespread practices were so well settled as to constitute *de facto* policy in the Cleveland Heights Police Department, and they were allowed to exist because municipal policymakers with authority over these practices exhibited deliberate indifference to the problems, effectively ratifying them.

198. Specifically, policymakers for the City on matters relating to the CHPD knew, among other things, that there was a need to implement policies, train, and supervise police officers on how to handle, preserve, and disclose exculpatory or impeachment evidence, how to conduct interrogations and witness interviews and interactions, how to conduct identifications including lineups and creation of photo arrays, how to write police reports or notes of witness statements, and how not to conduct unduly suggestive identifications or interviews.

199. The Defendant City is liable because the violation of Plaintiff's rights as described in this Complaint was caused by the policies, practices, customs, and/or actions of final policymakers for these Defendants.

200. Defendant City and the CHPD's policies and practices for training, supervising, monitoring, and disciplining its officers, and its code of silence, also caused the Defendant Officers to believe that they could abuse Miller's rights and cover up what they did—all without fear of discipline.

201.    As a matter of both policy and practice, municipal policy makers and CHPD supervisors condoned and facilitated a code of silence within the CHPD.  In accordance with this code, police department detectives refused to report, and otherwise lied about, misconduct committed by their colleagues, including the misconduct at issue in this case.  Defendant City of Cleveland Heights' training, supervisory, and disciplinary practices supported this code of silence, by protecting from discipline officers who engaged in misconduct and teaching police officers that they must abide by the code.

202.    As a result of Defendant City's and the CHPD's established practice of failing to track and identify police officers who are repeatedly accused of the same kinds of serious misconduct; failing to properly investigate cases in which the police are implicated in fabricating or suppressing evidence, as well as wrongful charges and convictions; failing to discipline officers accused of this unlawful conduct; and facilitating a code of silence within the CHPD, CHPD officers came to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences.

203.    The Defendant City's and CHPD's failure to train, supervise, and discipline its officers effectively condones, ratifies and sanctions the kind of misconduct that the Defendant Officers committed against Miller in this case.  Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of Defendant City of Cleveland Heights' practices and *de facto* policies, as alleged in this Complaint.

204.    Defendant City and officials within the CHPD failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct.

They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Miller's ongoing injuries.

205.     Consistent with the municipal policy and practice described herein, members of the CHPD, including but not limited to the Defendant Officers, systematically suppressed evidence pertaining to these fabricated and coerced statements, both from the prosecuting attorneys and from criminal defendants.

206.     The policies and practices described in this Complaint were consciously approved by Defendant City of Cleveland Heights policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

207.     As a direct and proximate result of Defendants' actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth in this Complaint.

**Christopher Miller's Injuries**

208.     Miller steadfastly maintained his innocence throughout his arrest, trial, and imprisonment.

209.     From the date of his arrest in 2001 until June 21, 2018, Miller remained continuously imprisoned.

210.     Miller's years of wrongful imprisonment deprived him of all things in life so many of us take for granted.

211.     Defendants robbed Miller of his hopes and dreams for his young life.  As a result of his wrongful conviction, Miller spent years locked up behind bars, with the liberties granted to free citizens stripped from him. Defendants destroyed Miller's life without any warning.

212.     Miller was deprived of the opportunity to maintain meaningful relationships with his children and their mother, his mother, aunt, cousins, other family, and friends.

213.     At the time Miller was arrested and imprisoned, his daughter Chareale was just 5 years old, his son, Chris, was just 2 years old, and Denazha was only a few days old.

214.     Miller suffered the deep pain of being deprived of the opportunity to build and maintain meaningful relationships with his children as they grew up. He was unable to be an active part of their lives, to support them and to show them he loved them, and to be present for important milestones and events. He was unable to protect and provide safety and refuge for his children in ways that they needed.

215.     During his wrongful incarceration, Miller was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right.  He missed out on the ability to share holidays, births, funerals, and other life events with loved ones, to continue his romantic relationship with Lena Green, to marry, and to pursue a career, and the fundamental freedom to live one's life as an autonomous human being.

216.     Miller was deprived of the opportunity to enjoy the financial and general benefits of employment and to plan for a secure future for himself and his family.

217.     Miller was deprived of the opportunity to seek additional education and job training and to have available to him many avenues to learn and gain experience in the world.

218.     Christopher Miller must now attempt to make a life for himself without the benefit of years of life experiences and with the burden of his prior imprisonment.

219.     As a result of Defendants' misconduct, Miller suffered various physical, mental, and emotional injuries in prison and continues to suffer today.

220.    In addition to the severe trauma of wrongful imprisonment and Miller's loss of
liberty, Defendants' misconduct continues to cause Miller extreme physical and psychological
pain and suffering, including extreme anxiety, PTSD, and other psychic injuries. He continues to
suffer the emotional trauma of not having been able to be available for his children during their
young lives.

221.    As a result of the foregoing, Plaintiff suffered tremendous damage, including
physical sickness and injury and emotional damages, all proximately caused by Defendants'
misconduct.

### Christopher Miller's Children

222.    Christopher Miller's children, Plaintiffs Chareale Miller, Christopher Miller, Jr.,
and Denazha Miller, suffered significant injuries as a result of Defendants' misconduct.

223.    Plaintiffs Chareale Miller, Christopher Miller, Jr., and Denazha Miller were
deprived of their father for over seventeen years, starting from the time they were very young.

224.    Miller was arrested in front of Chareale, who was just five years old at the time.
She still recalls in painful detail, as a twenty-five-year-old woman today, the moment her father
was arrested. She was terrified and traumatized by the experience.

225.    Chris and Denazha were very young—just 2 years old and a few days old—when
Miller was arrested. Their first memories of their father are of him in prison.

226.    Though they were able to maintain relationships with their father through visits
and calls, Chareale, Chris, and Denazha were unable to have the relationship with their father
that they wanted, deserved, and needed because he was wrongfully convicted and imprisoned.

227.     For all of Miller's children, living without their father and knowing he was in
prison and accused of rape was immeasurably painful. Even though they knew he was innocent,

34

other people's reactions to their father's conviction and imprisonment were humiliating and painful.

228.    Plaintiffs Chareale Miller, Christopher Miller, Jr., and Denazha Miller suffered and continue to suffer extreme mental anguish as a result of Defendants' conduct.

229.    Miller's children suffered the deep pain of being deprived of the opportunity to build and maintain meaningful relationships their father as they grew up, of having him as an active part of their lives, to support them and to show them he loved them.

230.    Plaintiffs Chareale Miller, Christopher Miller, Jr., and Denazha Miller were deprived of their father being there for them at home, for birthdays and holidays, at school and extracurricular events, and other important milestones and events. Chris Miller in particular missed his dad's presence at his sports activities and travel games.

231.    Chareale, Chris, and Denazha were deprived of the chance to be close to their father physically and emotionally during their childhoods and formative years. They were without his fatherly advice, guidance, and support. They were deprived of playing and laughing with their father. They were deprived of feeling his love and of loving him in person, in the flesh, free from false accusations and tainted perceptions.

232.    Christopher Miller's children suffered loss of affection, loss of guidance, loss of companionship, loss of protection and security, and loss of services from their father while he was wrongfully imprisoned.

233.    Miller's family also suffered loss of financial support during his incarceration.

234.    Since Miller's release from prison, his children have benefitted from rebuilding their relationships with him—but nothing can make up for their lost time and the effects of his wrongful conviction.

235.    The mental anguish suffered by family members was unbearable and greater than any reasonable person can be expected to endure.

236.    As a result of the foregoing, Plaintiffs Chareale Miller, Christopher Miller, Jr., and Denazha Miller suffered tremendous damage, including physical and emotional damages, all proximately caused by Defendants' misconduct.

## Count 1
### 42 U.S.C. § 1983 — Fourteenth Amendment:
### *Brady* Violations

237.    All of the foregoing paragraphs are incorporated as though fully set forth here.

238.    In the manner described more fully above, the Defendant Officers, acting individually, jointly, and in conspiracy with each other, deliberately destroyed, failed to disclose, and otherwise withheld and/or suppressed material exculpatory information from the prosecution, Plaintiff Christopher Miller, and Miller's defense counsel, including but not limited to evidence upon which State witnesses could be impeached and evidence of manipulative victim interviews and identification procedures.

239.    The Defendant Officers, while acting individually, jointly and in conspiracy with one another, denied Plaintiff his constitutional right not to be deprived of his liberty without due process of law.

240.    The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

241.    The Defendant Officers' misconduct directly resulted in the unjust criminal convictions of Plaintiff, thereby denying him his constitutional right to a fair trial guaranteed by the U.S. Constitution.  By their actions, the Defendant Officers thereby misled and misdirected the criminal prosecution of Plaintiff.  Absent this misconduct, the prosecution of Miller could not

and would not have been pursued, and there is a reasonable probability that he would not have been convicted.

242.    Furthermore, in the manner described more fully above, the Defendant Officers continued to withhold and/or suppress favorable and exculpatory evidence from prosecutors, Miller, and Miller's defense counsel even after his criminal trial, during sentencing, and during the time that Miller's appellate and post-conviction efforts were pending.

243.    In addition, upon information and belief, the Defendant Officers concealed and/or fabricated additional evidence that is not yet known to Plaintiff.

244.    As a direct and proximate result of the Defendants' actions, Christopher Miller's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

245.    Defendants are jointly and severally liable for this conduct.

**Count 2**
**42 U.S.C. § 1983 — Fourth and Fourteenth Amendments:**
**Fabrication of False Evidence**

246.    All of the foregoing paragraphs are incorporated as though fully set forth here.

247.    In the manner described more fully above, the Defendant Officers, acting individually, jointly and in conspiracy with each other, fabricated evidence, including without limitation, false police reports, fabricated statements and testimony, and manipulated L.B.'s memory, identifications, statements, and testimony, all offered as fabricated testimony at Christopher Miller's trial.

248.    In addition, upon information and belief, the Defendant Officers concealed and/or fabricated additional evidence that is not yet known to Plaintiff.

249. Defendants knowingly fabricated material evidence, and a reasonable likelihood exists that the false evidence affected the decision of the jury.  Defendants' actions violated Plaintiff's right to due process guaranteed by the U.S. Constitution.

250. The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

251. The Defendant Officers' misconduct directly resulted in the unjust criminal conviction of Plaintiff, thereby denying him his constitutional rights to a fair trial guaranteed by the U.S. Constitution.  Absent this misconduct, there would have been no probable cause for Plaintiff's continued detention, and the prosecution of Plaintiff could not and would not have been pursued.  This misconduct caused Plaintiff to be wrongfully convicted of crimes of which he is innocent.

252. As a direct and proximate result of the Defendants' actions, Christopher Miller's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

253. Defendants are jointly and severally liable for this conduct.

**Count 3**
**42 U.S.C. § 1983 — Fourteenth Amendment:**
**Unconstitutional Identification Procedures**

254. All of the foregoing paragraphs are incorporated as though fully set forth here.

255. In the manner described more fully above, the Defendant Officers, acting individually, jointly, and in conspiracy with each other, in the identification procedures noted above, fabricated evidence by using unduly and impermissibly suggestive identification procedures.

256.     The Officers were acting under color of law and within the scope of their employment when they took these actions.

257.     The Defendant Officers, while acting individually, jointly and in conspiracy with one another, denied Plaintiff rights under the Fourteenth Amendment., and their misconduct directly resulted in the unjust criminal convictions of Plaintiff.

258.     As a direct and proximate result of the Officers' actions, Christopher Miller's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

259.     Defendants are jointly and severally liable for this conduct.

**Count 4**
**42 U.S.C. § 1983 — Fourth and Fourteenth Amendments:**
**False Arrest**

260.     All of the foregoing paragraphs are incorporated as though fully set forth here.

261.     In the manner described more fully above, the Defendant Officers, acting individually, jointly, and in conspiracy with each other, caused Christopher Miller to be unreasonably seized, detained, imprisoned and deprived of his liberty without probable cause to believe that he had committed a crime, also including his extended detention, in violation of his rights secured by the Fourth and Fourteenth Amendments to the United States Constitution.

262.     The Defendant Officers, while acting individually, jointly and in conspiracy with one another, denied Plaintiff Fourth Amendment rights.

263.     The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

264.     As a direct and proximate result of the Defendants' actions, Christopher Miller's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

265.     Defendants are jointly and severally liable for this conduct.

### Count 5
### 42 U.S.C. § 1983 — Fourth and Fourteenth Amendments:
### Malicious Prosecution

266.     All of the foregoing paragraphs are incorporated as though fully set forth here.

267.     In the manner described more fully above, the Defendant Officers, acting individually, jointly, and in conspiracy with each other, instigated, influenced, or participated in the decision to prosecute Christopher Miller, and there was no probable cause for the criminal prosecution. As a consequence of the criminal prosecution, Plaintiff suffered a deprivation of liberty apart from his initial seizure.  Plaintiff's criminal prosecution was terminated in his favor in a manner indicative of innocence.

268.     The Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and the Defendant Officers made statements to other officers and/or to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

269.     Statements of the Defendant Officers regarding Plaintiff's alleged culpability were made with knowledge that these statements were false.  In so doing, the Defendants fabricated evidence and withheld exculpatory information.

270.     In the manner described more fully above, the Defendant Officers' misconduct denied Plaintiff his constitutional rights to procedural due process under the Fourteenth

Amendment and rights under the Fourth Amendment to be free from continued detention without probable cause. Absent this misconduct, there would have been no probable cause for Plaintiff's continued detention, and the prosecution of Plaintiff could not and would not have been pursued. This misconduct caused Plaintiff to be wrongfully convicted of crimes of which he is innocent.

271. Furthermore, in the manner described more fully above, the Defendant Officers, acting individually, jointly, and in conspiracy with each other, deliberately engaged in arbitrary and conscience-shocking conduct that contravened fundamental canons of decency and fairness and violated Plaintiff's substantive due process rights under the Fourteenth Amendment.

272. The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

273. As a direct and proximate result of the Defendants' actions, Christopher Miller's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

274. Defendants are jointly and severally liable for this conduct.

**Count 6**
**42 U.S.C. § 1983 — Failure to Intervene**

275. All of the foregoing paragraphs are incorporated as though fully set forth here.

276. In the manner described more fully above, during the constitutional violations described here, one or more of the Defendant Officers stood by without intervening to prevent the violation of Christopher Miller's constitutional rights, even though they had the opportunity to do so.

277.    The Defendant Officers' actions and omissions in the face of a constitutional duty to intervene were the direct and proximate cause of Plaintiff's constitutional violations and injuries, including but not limited to loss of liberty, physical harm, and emotional distress.

278.    The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

279.    As a direct and proximate result of the Defendants' actions, Christopher Miller's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

280.    Defendants are jointly and severally liable for this conduct.

**Count 7**
**42 U.S.C. § 1983 —** *Monell* **Claim**
**Against Defendant City of Cleveland Heights**

281.    All of the foregoing paragraphs are incorporated as though fully set forth here.

282.    Defendant City of Cleveland Heights is liable for the violations of Christopher Miller's constitutional rights as described in this Complaint by virtue of its official policies and practices.

283.    The Defendant Officers were acting under color of law and within the scope of their employment while engaged in the misconduct described above, undertaken pursuant to the policies, practices, and customs of the Defendant City and the CHPD.

284.    The policies, practices, and customs of the Defendant City and the CHPD were the moving force behind the misconduct described in this Count and behind the violations of Plaintiff's rights.  The widespread practices were so well settled as to constitute *de facto* policy in the Cleveland Heights Police Department, were part of CHPD culture, and were allowed to

42

exist because municipal policymakers with authority over the practices exhibited deliberate indifference to the problems, effectively ratifying them.

285.    In addition, the Defendants' misconduct was undertaken pursuant to the policy and practices of the Defendant City and the CHPD in that the violation of Plaintiff's rights, and as a result of conduct by the City's relevant final policymaker or the persons to whom final policymaking authority had been delegated.

286.    The actions of the Defendant Officers were approved, encouraged, and/or ratified by policymakers for the Defendant City and the CHPD with final policymaking authority.

287.    These policies, practices, and customs included the failure to adequately train, supervise, monitor, and discipline officers who engaged in constitutional violations, pursuing wrongful convictions through reliance on profoundly flawed investigations, unduly suggestive identifications, and manipulated, fabricated, and suppressed evidence, and the police code of silence as described in this Complaint.

288.    The CHPD's customs, policies, and practices, including ratification and acquiescence in civil rights violations and use of the police code of silence, false arrest, malicious prosecution, *Brady* violations, fabrication of evidence, and failure to intervene is documented in other cases, including but not limited to *Randazzo v. City of Cleveland Heights, et al.,* U.S.D.C. N.D. Ohio Case No. 1:2008cv00461.

289.    One or more of the policies, practices, and/or customs described in this Complaint were maintained and implemented by Defendant City of Cleveland Heights with deliberate indifference to Plaintiff's constitutional rights and were a moving force behind the violations of those rights.

290.    These widespread practices were so well-settled as to constitute de facto policy in the Cleveland Heights Police Department, were part of CHPD culture, and were allowed to exist because municipal policymakers with authority over the conduct exhibited deliberate indifference to the problems, thereby effectively ratifying them.

291.    Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because the Defendant City and the CHPD declined to implement sufficient policies or training on the disclosure of exculpatory evidence, fabrication of evidence, feeding information to victims and witnesses, engaging in manipulative, leading, or unduly suggestive questioning of and contact with victims and witnesses, and unduly suggestive lineups and photo identifications, even though the need for such policies and training was obvious. The Defendant City and the CHPD also declined to implement any legitimate mechanism for oversight or punishment of officers who committed such misconduct, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

292.    As a direct and proximate result of the Defendant City of Cleveland Heights' actions and inactions, Christopher Miller's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

293.    Defendants are jointly and severally liable for this conduct.

### Count 8
### Ohio State Law — Negligence: Willful, Wanton, and/or Reckless Conduct

294.    All of the foregoing paragraphs are incorporated as though fully set forth here.

295.    Plaintiff Christopher Miller suffered as a result of the Defendant Officers' negligent, willful, wanton, and/or reckless conduct.

296.     Defendant Officers failed to exercise due care and acted with malicious purpose, in bad faith, and/or in a wanton or reckless manner, and engaged in willful, wanton, and/or reckless conduct, while engaged in police functions and activities, including but not limited to *Brady* violations, the fabrication of evidence, unconstitutional identification procedures, false arrest, malicious prosecution, the failure to intervene during civil-rights violations, and conspiracy to deprive constitutional rights,  giving rise to constitutional violations as described in this Complaint.

297.     As a direct and proximate result of Defendants' willful, wanton, and/or reckless conduct, Plaintiff's constitutional rights were violated and he suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

298.     Defendants are jointly and severally liable for this conduct.

### Count 9
### Ohio State Law — Intentional Infliction of Emotional Distress

299.     All of the foregoing paragraphs are incorporated as though fully set forth here.

300.     Plaintiff Christopher Miller suffered intentional infliction of emotional distress as a result of Defendants' conduct.

301.     Defendants intended to cause emotional distress or knew or should have known that their actions would result in serious emotional distress to Miller.

302.     Defendants' conduct was extreme and outrageous, and their actions were the proximate cause of Miller's psychic injuries.

303.     The mental anguish suffered by Christopher Miller is serious and of a nature that no reasonable person could be expected to endure it.

304.     As a direct and proximate result of Defendants' conduct, Plaintiff Christopher Miller suffered injuries and damages, including but not limited to loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

305.     Defendants are jointly and severally liable for this conduct.

### Count 10
### Ohio State Law — Loss of Consortium

306.     All of the foregoing paragraphs are incorporated as though fully set forth here.

307.     Plaintiffs Chareale Miller, Christopher Miller, Jr., and Denazha Miller, minor children at the time of Christopher Miller's arrest and imprisonment, suffered loss of consortium as a result of Defendants' conduct.

308.     As a direct and proximate result of Defendants' conduct, Plaintiffs Chareale Miller, Christopher Miller, Jr., and Denazha Miller suffered injuries and damages as set forth above.

309.     Defendants are jointly and severally liable for this conduct.

### PRAYER FOR RELIEF

Plaintiff **Christopher Miller** and his children, Plaintiffs **Chareale Miller**, **Christopher Miller, Jr.**, and **Denazha Miller**, respectfully request that this Court enter judgment in their favor and against **Defendants City of Cleveland Heights**, **Schmitt**, and **Osowski**, awarding: (a) compensatory and consequential damages, costs, and attorneys' fees (including those pursuant to 42 U.S.C. § 1988) against each Defendant, jointly and severally; along with (b) punitive damages against each of the individual Defendants; as well as (c) any other relief this Court deems appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated: June 20, 2020                    Respectfully submitted,

                                        FRIEDMAN & GILBERT

                                        */s/ Jacqueline Greene*
                                        Jacqueline Greene (0092733)
                                        Sarah Gelsomino (0084340)
                                        Terry H. Gilbert (0021948)
                                        Marcus Sidoti (0077476)
                                        50 Public Square, Ste. 1900
                                        Cleveland, OH  44113
                                        T: (216) 241-1430
                                        F: (216) 621-0427
                                        jgreene@f-glaw.com
                                        sgelsomino@f-glaw.com
                                        tgilbert@f-glaw.com
                                        marcus@f-glaw.com

                                        *Attorneys for Plaintiff Christopher Miller*